# UNITED STATES DISTRICT COURT

for the

Eastern District of Pennsylvania

| In the Matter of the Search of | ) | |
|---|---|---|
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No. 21-MJ-5 |
| InfInformation associated with the Apple iCloud account associated with e-mail address "sailesproductions@yahoo.com" | ) ) ) ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____ Northern _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

❏ contraband, fruits of crime, or other items illegally possessed;

❏ property designed for use, intended for use, or used in committing a crime;

❏ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 922(a)(1)(A); | Dealing Firearms Without a License; |
| 18 U.S.C. § 922(a)(6) | Materially False Statements to a Federal Firearms Licensee |

The application is based on these facts:

See attached Affidavit, incorporated herein.

☑ Continued on the attached sheet.

❏ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
s/ Alan Gilmore
*Applicant's signature*

Alan Gilmore, ATF Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ telephone _____ *(specify reliable electronic means).*

Date: _____ 01/05/2021 _____

Henry S. Perkin
Digitally signed by Henry S. Perkin
DN: cn=Henry S. Perkin, o=U.S. Courts, ou,
email=judge_henry_perkin@paed.uscourts.gov, c=US
Date: 2021.01.04 17:52:32 -05'00'
*Judge's signature*

City and state: _____ Philadelphia, Pennsylvania _____

Henry S. Perkin, U.S. Magistrate Judge
*Printed name and title*

IN THE MATTER OF THE SEARCH OF
THE ICLOUD ACCOUNT ASSOCIATED
WITH EMAIL ADDRESS
"sailesproductions@yahoo.com"
STORED AT PREMISES CONTROLLED
BY APPLE, INC.

Case No. 21-MJ-5

<u>UNDER SEAL</u>

<u>**AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT**</u>

I, Special Agent Alan Gilmore, of the Bureau of Alcohol, Tobacco, Firearms and

Explosives ("ATF") being duly sworn, deposes and states as follows:

<u>**INTRODUCTION AND AGENT BACKGROUND**</u>

1.      I submit this affidavit in support of an application for a search warrant under 18

U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A), as well as Federal Rule of Criminal

Procedure 41 authorizing the search of the iCloud Account associated with the email address

"sailesproductions@yahoo.com" (the "**TARGET ACCOUNT**"), further described in

Attachment A, which is stored at premises controlled by Apple, Inc. ("Apple"), 1 Infinite Loop,

Cupertino, CA  95014, and associated with an Apple iPhone SE, bearing serial number

F18CQS2PPLJP (the "**SUBJECT ELECTRONIC DEVICE**"), owned by Fredrick NORMAN,

for the things described in Attachment B, using the protocols described in Attachment B.

2.      I am a Special Agent with the United States Department of Justice, Bureau of

Alcohol, Tobacco, Firearms and Explosives (ATF) and have been so employed since January

2017. Prior to joining ATF, I was employed as a Detective and Police Officer with the

Philadelphia Police Department for approximately five years. I am currently assigned to a

specialized enforcement group, the ATF Firearms Trafficking Group, whose primary mission is

to investigate those individuals and groups that are engaged in the commission of diverting

firearms to the illegal firearms market. During my tenure as an ATF agent, I have conducted and

participated in investigations, which have resulted in the arrest and prosecution of individuals who have committed violations of federal law, including but not limited to firearms offenses and narcotics trafficking.

3.     The information in this affidavit derives from my personal knowledge and observations, discussions with other ATF agents and employees, other law enforcement officers, and witnesses, and my review of police reports and public records.  All conversations and statements described in this affidavit are related in substance and in part unless otherwise indicated.  Because I submit this affidavit for the limited purpose of establishing probable cause for a search warrant, I have not included every fact known to me concerning this investigation.  Rather, I set forth only those facts that I believe are necessary to establish probable cause.  I have not, however, excluded any information known to me that would defeat a determination of probable cause.

4.     Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 922(a)(1)(A) (Dealing Firearms Without a License) and 18 U.S.C. § 922(a)(6) (Materially False Statements to a Federal Firearms Licensee) (together, the "Target Offenses"), have been committed by Fredrick NORMAN ("F. NORMAN"), Brianna WALKER, Stephen NORMAN ("S. NORMAN"), Charles O'BANNON, and possibly others.  Furthermore, investigators believe that F. NORMAN has used the **SUBJECT ELECTRONIC DEVICE** in furtherance of those crimes, and that the device stores information related to those crimes in the **TARGET ACCOUNT**.  Therefore, probable cause exists to search the item in Attachment A for evidence, instrumentalities, contraband, or fruits of those crimes as described in Attachment B.

## APPLE ACCOUNTS AND iCLOUD[1]

5.      Apple is a company based in the United States that produces the iPhone, iPad, and iPod Touch, all of which use the iOS operating system and desktop and laptop computers based on the Mac OS operating system.

6.      Apple provides a variety of services that can be accessed from Apple devices or, in some cases, other devices via web browsers or mobile and desktop applications ("apps").  As described in further detail below, the services include email, instant messaging, and file storage:

> a.      Apple provides email service to its users through email addresses at the domain names mac.com, me.com, and icloud.com.
>
> b.      iMessage and FaceTime allow users of Apple devices to communicate in real-time.  iMessage enables users of Apple devices to exchange instant messages ("iMessages") containing text, photos, videos, locations, and contacts, while FaceTime enables those users to conduct video calls.
>
> c.      iCloud is a file hosting, storage, and sharing service provided by Apple.  iCloud can be utilized through numerous iCloud-connected services, and can also be used to store iOS device backups and data associated with third-party apps.

---

[1] The information in this section is based on information published by Apple on its website, including, but not limited to, the following document and webpages: "U.S. Law Enforcement Legal Process Guidelines," available at http://images.apple.com/privacy/docs/legal-process-guidelines-us.pdf; "Create and start using an Apple ID," available at https://support.apple.com/en-us/HT203993; "iCloud," available at http://www.apple.com/icloud/; "What does iCloud back up?," available at https://support.apple.com/kb/PH12519; "iOS Security," available at https://www.apple.com/business/docs/iOS_Security_Guide.pdf, and "iCloud: How Can I Use iCloud?," available at https://support.apple.com/kb/PH26502.

d.      iCloud-connected services allow users to create, store, access, share, and synchronize data on Apple devices or via icloud.com on any Internet-connected device.  For example, iCloud Mail enables a user to access Apple-provided email accounts on multiple Apple devices and on icloud.com.  iCloud Photo Library and My Photo Stream can be used to store and manage images and videos taken from Apple devices, and iCloud Photo Sharing allows the user to share those images and videos with other Apple subscribers.  iCloud Drive can be used to store presentations, spreadsheets, and other documents.  iCloud Tabs and bookmarks enable iCloud to be used to synchronize bookmarks and webpages opened in the Safari web browsers on all of the user's Apple devices.  iWork Apps, a suite of productivity apps (Pages, Numbers, Keynote, and Notes), enables iCloud to be used to create, store, and share documents, spreadsheets, and presentations.  iCloud Keychain enables a user to keep website username and passwords, credit card information, and Wi-Fi network information synchronized across multiple Apple devices.

e.      Game Center, Apple's social gaming network, allows users of Apple devices to play and share games with each other.

f.      Find My iPhone allows owners of Apple devices to remotely identify and track the location of, display a message on, and wipe the contents of those devices.  Find My Friends allows owners of Apple devices to share locations.

g. Location Services allows apps and websites to use information from cellular, Wi-Fi, Global Positioning System ("GPS") networks, and Bluetooth, to determine a user's approximate location.

h. App Store and iTunes Store are used to purchase and download digital content. iOS apps can be purchased and downloaded through App Store on iOS devices, or through iTunes Store on desktop and laptop computers running either Microsoft Windows or Mac OS. Additional digital content, including music, movies, and television shows, can be purchased through iTunes Store on iOS devices and on desktop and laptop computers running either Microsoft Windows or Mac OS.

8. Apple services are accessed through the use of an "Apple ID," an account created during the setup of an Apple device or through the iTunes or iCloud services. A single Apple ID can be linked to multiple Apple services and devices, serving as a central authentication and syncing mechanism.

9. An Apple ID takes the form of the full email address submitted by the user to create the account; it can later be changed. Users can submit an Apple-provided email address (often ending in @icloud.com, @me.com, or @mac.com) or an email address associated with a third-party email provider (such as Gmail, Yahoo, or Hotmail). The Apple ID can be used to access most Apple services (including iCloud, iMessage, and FaceTime) only after the user accesses and responds to a "verification email" sent by Apple to that "primary" email address. Additional email addresses ("alternate," "rescue," and "notification" email addresses) can also be associated with an Apple ID by the user.

10.     Apple captures information associated with the creation and use of an Apple ID. During the creation of an Apple ID, the user must provide basic personal information including the user's full name, physical address, and telephone numbers.  The user may also provide means of payment for products offered by Apple.  The subscriber information and password associated with an Apple ID can be changed by the user through the "My Apple ID" and "iForgot" pages on Apple's website.  In addition, Apple captures the date on which the account was created, the length of service, records of log-in times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to and utilize the account, the Internet Protocol address ("IP address") used to register and access the account, and other log files that reflect usage of the account.

11.     Additional information is captured by Apple in connection with the use of an Apple ID to access certain services.  For example, Apple maintains connection logs with IP addresses that reflect a user's sign-on activity for Apple services such as iTunes Store and App Store, iCloud, Game Center, and the My Apple ID and iForgot pages on Apple's website.  Apple also maintains records reflecting a user's app purchases from App Store and iTunes Store, "call invitation logs" for FaceTime calls, "query logs" for iMessage, and "mail logs" for activity over an Apple-provided email account.  Records relating to the use of the Find My iPhone service, including connection logs and requests to remotely lock or erase a device, are also maintained by Apple.

12.     Apple also maintains information about the devices associated with an Apple ID. When a user activates or upgrades an iOS device, Apple captures and retains the user's IP address and identifiers such as the Integrated Circuit Card ID number ("ICCID"), which is the serial number of the device's SIM card.  Similarly, the telephone number of a user's iPhone is

linked to an Apple ID when the user signs in to FaceTime or iMessage.  Apple also may

maintain records of other device identifiers, including the Media Access Control address ("MAC

address"), the unique device identifier ("UDID"), and the serial number.  In addition,

information about a user's computer is captured when iTunes is used on that computer to play

content associated with an Apple ID, and information about a user's web browser may be

captured when used to access services through icloud.com and apple.com.  Apple also retains

records related to communications between users and Apple customer service, including

communications regarding a particular Apple device or service, and the repair history for a

device.

       13.    Apple provides users with five gigabytes of free electronic space on iCloud, and

users can purchase additional storage space.  That storage space, located on servers controlled by

Apple, may contain data associated with the use of iCloud-connected services, including: email

(iCloud Mail); images and videos (iCloud Photo Library, My Photo Stream, and iCloud Photo

Sharing); documents, spreadsheets, presentations, and other files (iWork and iCloud Drive); and

web browser settings and Wi-Fi network information (iCloud Tabs and iCloud Keychain).

iCloud can also be used to store iOS device backups, which can contain a user's photos and

videos, iMessages, Short Message Service ("SMS") and Multimedia Messaging Service

("MMS") messages, voicemail messages, call history, contacts, calendar events, reminders,

notes, app data and settings, Apple Watch backups, and other data.  Records and data associated

with third-party apps may also be stored on iCloud; for example, the iOS app for WhatsApp, an

instant messaging service, can be configured to regularly back up a user's instant messages on

iCloud Drive.  Some of this data is stored on Apple's servers in an encrypted form but can

nonetheless be decrypted by Apple.

14.     In my training and experience, evidence of who was using an Apple ID and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records described above.  This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

15.     In addition, the user's account activity, logs, stored electronic communications, and other data retained by Apple can indicate who has used or controlled the account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, subscriber information, email and messaging logs, documents, and photos and videos (and the data associated with the foregoing, such as geo-location, date and time) may be evidence of who used or controlled the account at a relevant time.  As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices were used to access the account.  Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.

16.     Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation.  For example, information on the account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

17.     Other information connected to an Apple ID may lead to the discovery of additional evidence.  For example, the identification of apps downloaded from App Store and iTunes Store may reveal services used in furtherance of the crimes under investigation or services used to communicate with co-conspirators.  In addition, emails, instant messages, Internet activity, documents, and contact and calendar information can lead to the identification of co-conspirators and instrumentalities of the crimes under investigation.

18.     Also, through my training and experience, I know that users who register a new device using iCloud, do so to transfer the type of data described above from their old device to their new device, or to set up their new device to store said data in the future.  Typically, this indicates that the user has, or intends to, frequently use iCloud to create backups of the data on their device.  After iCloud is set-up, the device will automatically backup the data each day when the device is connected to a power source and a Wi-Fi network.

19.     Therefore, Apple's servers are likely to contain stored electronic communications and information concerning subscribers and their use of Apple's services.  In my training and experience, such information may constitute evidence of the Target Offenses, including information that can be used to identify the account's user or users.

## PROBABLE CAUSE

## A.     INVESTIGATION INTO FIREARMS

20.     In October 2020, investigators became aware of a series of firearms recovered in Philadelphia, Pennsylvania and Atlantic City, New Jersey, which were originally purchased by Fredrick NORMAN, Brianna WALKER, Stephen NORMAN, and Charles O'BANNON in the greater Atlanta, Georgia area. Records checks revealed the following firearms purchases:

a.  Between May 27, 2020, and November 27, 2020, Fredrick NORMAN purchased at least 146 firearms from approximately 20 different Federal Firearms Licensees.

b.  Between June 24, 2020, and November 27, 2020, Brianna WALKER purchased at least 40 firearms from approximately 15 different Federal Firearms Licensees.

c.   Between September 19, 2020, and October 14, 2020, Stephen NORMAN purchased at least 13 firearms from approximately 9 different Federal Firearms Licensees.

d.  Between August 5, 2020, and November 11, 2020, Charles O'BANNON purchased at least 61 firearms from approximately 16 different Federal Firearms Licensees.

21.     On July 24, 2020, the Philadelphia Police Department recovered a Taurus, model G2S, 9mm pistol, bearing serial number ABE615596, relative to the arrest of Kevin JACKSON at 4901 Penn Street, Philadelphia Pennsylvania. It was determined that the firearm was purchased by Brianna WALKER on June 24, 2020, at Arrowhead Pawn Shop, a Federal Firearms Licensee located at 6433 Tara Boulevard, #A, Jonesboro, Georgia. It was determined that the firearm's time from purchase to recovery was 30 days.

22.     On August 5, 2020, the Philadelphia Police Department recovered a SCCY, model CPX-1, 9mm pistol, bearing serial number 801512, relative to the arrest of Tauqeer LEONARD at 600 Godfrey Avenue, Philadelphia, Pennsylvania. It was determined the firearm was purchased by Fredrick NORMAN on July 24, 2020, at Cherokee Gun and Pawn, a Federal Firearms Licensee located at 9430 Knox Bridge Highway, Canton, Georgia. It was determined

that the firearm's time from purchase to recovery was 12 days[2]. Records checks show LEONARD is a previously convicted felon for possession of narcotics with the intent to deliver in Philadelphia County, Pennsylvania.

23.     On August 10, 2020, the Atlantic City Department recovered a Taurus, model G3, 9mm pistol, bearing serial number ABE631701, in a hotel room at 777 Harrah's Boulevard, Room 15035, Atlantic City, New Jersey. Records indicate the occupants of the hotel room were Mylinda WRIGHT and Justin WILLIAMS. It was determined that the firearm was purchased by Fredrick NORMAN on July 16, 2020, at Appalachian Gun and Pawn, a Federal Firearms Licensee located at 140 Shelby Lane, Jasper, Georgia. It was determined that the firearm's time from purchase to recovery was 25 days. Records checks show WILLIAMS is a previously convicted felon for possession of a firearm without a license and possession of narcotics with intent to distribute in Philadelphia County, Pennsylvania.

24.     On September 3, 2020, the Philadelphia Police Department recovered a Smith and Wesson, model M&P 9 Shield, 9mm pistol, bearing serial number JEV4125 relative to the service of a search warrant at 2634 Germantown Avenue, Philadelphia, Pennsylvania. It was determined that the firearm was purchased by Fredrick NORMAN on July 12, 2020, at Academy Sports + Outdoors #107, a Federal Firearms Licensee located at 1585 Scenic Highway, Snellville, Georgia. It was determined that the firearm's time from purchase to recovery was 53 days.

---

[2] "Time to Crime" is a term used by investigators that counts the number of days from when a firearm is purchased at a Federal Firearms Licensee ("FFL") until the day it is recovered, often in connection with a crime, by a law enforcement agency. The national average for a firearm recovery in the United States is approximately nine years.

25.     On September 30, 2020, the Philadelphia Police Department recovered a Sarsilmaz, model B6, 9mm pistol, bearing serial number T1102-20E03517, relative to the arrest of Mikel McCRAY at 600 Franklin Place, Philadelphia, Pennsylvania. It was determined that the firearm was purchased by Charles O'BANNON on September 4, 2020, at Adventure Outdoors, a Federal Firearms Licensee located at 2500 South Cobb Road, Smyrna, Georgia. It was determined that the firearm's time from purchase to recovery was 26 days. Records checks show McCRAY is a previously convicted felon for possession of a firearm without a license in Philadelphia County, Pennsylvania.

26.     On October 7, 2020, the Philadelphia Police Department recovered three firearms relative to the arrest of Robert MAJOR at 2601 North 6th Street, Philadelphia, Pennsylvania:

    a. A Taurus, model G2C, 9mm pistol, bearing serial number ABG646726. It was determined that the firearm was purchased by Brianna WALKER on June 26, 2020, at Adventure Outdoors, a Federal Firearms Licensee, located at 2500 South Cobb Drive, Smyrna, Georgia. It was determined that the firearm's time from purchase to recovery was 103 days.

    b. A Taurus, model PT140 G2, .40 caliber pistol, bearing serial number ABH811465. It was determined that the firearm was purchased by Charles O'BANNON on September 5, 2020, at City Pawn of Carrollton, a Federal Firearms Licensee located at 903 South Park Street, Suite B, Carrollton, Georgia. It was determined that the firearm's time from purchase to recovery was 32 days.

    c. A Taurus, model PT140 G2, .40 caliber pistol, bearing serial number ABJ904448. It was determined that the firearm was purchased by Stephen NORMAN on September 21, 2020, at City Pawn of Carrollton, a Federal Firearms Licensee

located at 903 South Park Street, Suite B, Carrollton, Georgia. It was determined

that the firearm's time from purchase to recovery was 16 days.

 d. Records checks show MAJOR is a previously convicted felon for possession of

 narcotics with intent to distribute in Philadelphia County, Pennsylvania

27. On November 21, 2020, the Philadelphia Police Department recovered a Smith

and Wesson, model M&P 9 Shield, 9mm pistol, bearing serial number JEU4749, relative to the

arrest of Antonio CALDWELL at 4200 Germantown Avenue, Philadelphia, Pennsylvania. It was

determined that the firearm was purchased by Fredrick NORMAN on July 16, 2020, at

Appalachian Gun and Pawn, a Federal Firearms Licensee located at 140 Shelby Lane, Jasper,

Georgia. It was determined that the firearm's time from purchase to recovery was 128 days.

Records checks show CALDWELL is a previously convicted felon for possession of narcotics

with intent to distribute in Philadelphia County, Pennsylvania.

28. On November 22, 2020, the Philadelphia Police Department recovered a

Sarsilmaz, model CM9, 9mm pistol, bearing serial number T1102-20BD50625, relative to the

arrest of Shykim THOMAS at 2000 North 5th Street, Philadelphia, Pennsylvania. It was

determined that the firearm was purchased by Charles O'BANNON on August 25, 2020, at

Adventure Outdoors, a Federal Firearms Licensee located at 2500 South Cobb Road, Smyrna,

Georgia. It was determined that the firearm's time from purchase to recovery was 89 days.

Records checks show THOMAS is a previously convicted felon for access device fraud in

Philadelphia County, Pennsylvania.

29. On November 23, 2020, the Philadelphia Police Department recovered a Taurus,

model G2C, 9mm pistol, bearing serial number ABB331275, relative to the arrest of David

MACEY at 1400 West York Street, Philadelphia, Pennsylvania. It was determined that the

firearm was purchased by Fredrick NORMAN on July 16, 2020, at Appalachian Gun and Pawn, a Federal Firearms Licensee located at 140 Shelby Lane, Jasper, Georgia. It was determined that the firearm's time from purchase to recovery was 130 days.

30.     On November 24, 2020, the Philadelphia Police Department recovered a Taurus, model G2C, 9mm pistol, bearing serial number ABJ959228, relative to the arrest of Shakeem BRUCE at 6300 Greenway Avenue, Philadelphia, Pennsylvania. It was determined that the firearm was purchased by Fredrick NORMAN on October 1, 2020, at Academy Sports + Outdoors #124, a Federal Firearms Licensee located at 4215 Jimmy Lee Parkway, Hiram, Georgia. It was determined that the firearm's time from purchase to recovery was 54 days.

**B.     INVESTIGATION INTO THE TARGETS**

31.     ATF Agents received ATF Form 4473, Firearms Transaction Records for firearms purchases made by Fredrick NORMAN at various Academy Sports + Outdoors locations in the state of Georgia. An ATF 4473 is a required form of documentation for the purchase of a firearm from a Federal Firearm Licensee.  The 4473 requires the entry of a number of items of information about the firearm purchase including the purchaser's name, verification of identity and the purchaser's contact information, including address and phone number.  The 4473 also requires that the information provided by the purchaser is true and correct and that false statements made therein are punishable as criminal violations.  A review of these documents show that F. NORMAN provided a telephone number of (404) 200-3074 in connection with the purchase. F. NORMAN also provided an email address of "sailesproductions@yahoo.com" and listed his current address of residence as 2317 Vineyard Court, Villa Rica, Georgia.

32.     ATF Agents received ATF Form 4473, Firearms Transaction Records for firearms purchases made by Brianna WALKER at various Academy Sports + Outdoors locations in the

state of Georgia. A review of these documents show that WALKER provided a telephone number of (678) 663-7067. WALKER also provided email addresses of "marszypooh@gmail.com" and "briiwalkss@gmail.com." WALKER listed her current address of residence as 1901 Old Concord Road SE, Apartment C5, Smyrna, Georgia.

33.     ATF Agents received ATF Form 4473, Firearms Transaction Records for firearms purchases made by Stephen NORMAN at various Academy Sports + Outdoors locations in the state of Georgia. A review of these documents show that S. NORMAN provided a telephone number of (404) 918-0169. S. NORMAN also provided an email address of "stephenwrman16@yahoo.com" and listed his current address of residence as 2317 Vineyard Court, Villa Rica, Georgia.

34.     ATF Agents received ATF Form 4473, Firearms Transaction Records for firearms purchases made by Charles O'BANNON at various Academy Sports + Outdoors locations in the state of Georgia. A review of these documents show that O'BANNON provided a telephone number of (313) 820-1739. O'BANNON also provided an email address of "charlesvo98@gmail.com" and listed his place of residence as 2506 Grayton Loop, Villa Rica, Georgia.

35.     Agents identified an Instagram account, "@helllgnaw," associated with Brianna WALKER. The account features photographs of a female believed to be WALKER based on a comparison of WALKER's Georgia driver's license photograph and the female featured in the account. Account subscriber information indicates the email address associated with account is "briiwalkss@gmail.com," the same address used by WALKER to purchase firearms from various Academy Sports + Outdoors locations. The account features numerous photographs of WALKER brandishing firearms and smoking what Agents believe, based on their training and

experience, to be marijuana, sometimes while brandishing firearms. The account features

"stories," an Instagram function where a user can publish photographs, which are displayed for

only 24 hours and then removed. In one of these "stories," WALKER shares a video of another

user "@lil_joi." The video depicts an Uzi style firearm on a bed with the caption "Thank you

@helllgnaw." It is my belief that WALKER provided this firearm to "lil_joi." The "@helllgnaw"

account features photographs of WALKER with a male believed to be Fredrick NORMAN. Both

WALKER and F. NORMAN are brandishing firearms. WALKER's account identifies this male

as using Instagram account "@slowkeyfred."

36.     Agents identified an Instagram account, "@slowkeyfred," associated with

Fredrick NORMAN. The account features photographs of a male believed to be F. NORMAN

based on a comparison of F. NORMAN's Georgia driver's license photograph and the male

featured in the account. The account features several photographs of F. NORMAN standing at

the rear of a silver Dodge Charger. The background of these photographs show several houses,

which are consistent with a Google Maps Street View of the area outside of 2317 Vineyard

Court, Villa Rica, Georgia. This is the address used by both Fredrick NORMAN and Stephen

NORMAN to purchase firearms.

37.     Agents identified an Instagram account, "@evenstevennnnn," associated with

Stephen NORMAN. The account features photographs of a male believed to be S. NORMAN

based on a comparison of S. NORMAN's Georgia driver's license photograph and the male

featured in the account. The account features several photographs of S. NORMAN standing in a

kitchen with a large amount of ammunition stacked on the counter behind him. The photographs

are tagged with a location "Morningside Court Apartments." A records check indicated the

Morningside Court Apartments to be located at 594 Wimbledon Road NE, Atlanta, Georgia. A

review of photographs of the Morningside Court Apartments show that the exterior façade appears to be the same as the buildings shown in several photographs displayed on WALKER's Instagram. An open-source database check showed WALKER has previously used the address, 594 Wimbledon Road NE, Apartment 1133, Atlanta, Georgia.

38.     On November 30, 2020, Agents initiated surveillance of 594 Wimbledon Road NE, Atlanta Georgia. Agents observed Fredrick NORMAN and Brianna WALKER exit the apartment building, enter a silver Honda Accord, and leave the apartment parking lot. After a brief period, F. NORMAN and WALKER returned to the apartment parking lot in the silver Honda Accord and entered the apartment building. Agents were unable to see which apartment NORMAN and WALKER entered based on their vantage point.

39.     On November 30, 2020, Agents interviewed employees of City Pawn of Carrollton, 903 South Park Street, Suite B, Carrollton, Georgia. Employees stated they recognized Fredrick NORMAN, Brianna WALKER, Charles O'BANNON, and Stephen NORMAN from prior firearms purchases. Employees stated F. NORMAN and WALKER were usually together and at one point F. NORMAN asked to purchase every Taurus firearm they had in stock. When employees asked F. NORMAN why he needed so many firearms, F. NORMAN stated that he was selling them. Employees subsequently informed F. NORMAN that he needed a license to sell firearms at that volume, to which F. NORMAN attempted to alter his story. Employees provided Agents with ATF Forms 4473, Firearms Transaction Records, for purchases made by F. NORMAN, S. NORMAN, and O'BANNON.

40.     On December 1, 2020, Agents went to 594 Wimbledon Road NE, Apartment 1133, Atlanta, Georgia, to interview Fredrick NORMAN and Brianna WALKER. WALKER answered the door and stated she was alone. WALKER agreed to speak with Agents in their

vehicle. Agents advised WALKER that she was not under arrest and free to leave at any time.

Agents activated a recording device to memorialize the interview. During the interview,

WALKER admitted to violations of 18 U.S.C. § 922(a)(1)(A) (dealing firearms without a

license), 18 U.S.C. § 922(a)(6) (Materially False Statements to a Federal Firearms Licensee) and

18 U.S.C. § 922(g)(3) (possession of a firearm by a user of unlawful substances). WALKER

stated she had purchased approximately 50-60 firearms and had sold these firearms for $150-250

profit per firearm. WALKER admitted to being a habitual, daily user of marijuana, despite

WALKER marking "No" on ATF Form 4473, Question 11e. That question asks, "Are you an

unlawful user of, or addicted to, marijuana or any depressant, stimulant, narcotic drug, or any

other controlled substance?"  WALKER provided Agents with consent to search her apartment,

594 Wimbledon Road NE, Apartment 1133, Atlanta, Georgia, and her cellular telephone, an

iPhone 11, serial number C8PCKBSBN72N.

        41.    On December 1, 2020, Agents performed a consensual search of 594 Wimbledon

Road NE, Apartment 1133, Atlanta, Georgia. Agents recovered over 4,000 rounds of

ammunition, 183 firearms boxes, a small amount of green leafy substance suspected to be

marijuana, and various paraphernalia associated with narcotics trafficking including a scale and

small zip-top plastic bags. Most of the seized firearm boxes specify the make, model, caliber,

and serial number specific to the firearm it contains or contained. Although the firearms boxes

were empty, investigators were still able to identify relevant information about the firearm to

determine its purchaser. An initial review of the firearms boxes showed 69 were from firearms

known to have been purchased by Fredrick NORMAN, 37 were from firearms known to have

been purchased by Charles O'BANNON, 9 were from firearms known to have been purchased

by Stephen NORMAN, and 9 were from firearms known to have been purchased by Brianna WALKER.

42.     On December 1, 2020, Agents performed a consensual search of Brianna WALKER's cellular telephone, an iPhone 11, serial number C8PCKBSBN72N. Agents observed numerous text messages discussing the sale and purchase of firearms. In these text messages, WALKER would take orders for firearms, as well as make arrangements to sell firearms to individuals, including: setting the price for firearms, the location to meet to sell the firearms, and the makes and models of firearms the individuals desired. Agents observed a text message conversation between WALKER and "Frediana," which Agents believe to be Fredrick NORMAN based on the telephone number, (404) 200-3074. In this conversation, dated December 1, 2020, the same date Agents interviewed WALKER, WALKER informs NORMAN that the ATF is at the apartment and NORMAN advises her to "Don't say nun" and "Just say u sold it at a gun show or sum."

43.     On December 1, 2020, while Agents were interviewing WALKER, Fredrick NORMAN returned to 549 Wimbledon Road NE, Atlanta, Georgia, in the silver Honda Accord. Agents attempted to approach F. NORMAN to speak with him and F. NORMAN fled that location in the silver Honda Accord. Agents attempted to follow F. NORMAN but he drove away at a high rate of speed and Agents were unable to follow him. A short period of time later, F. NORMAN returned to 549 Wimbledon Road NE and again, Agents attempted to approach F. NORMAN to speak with him. Again, F. NORMAN fled the parking lot at a high rate of speed and Agents were unable to follow him. A short time later, F. NORMAN returned to 549 Wimbledon Road NE and parked the silver Honda Accord in the parking lot of that location. Agents approached F. NORMAN, advised F. NORMAN that he was not under arrest, and F.

NORMAN agreed to speak with them. Agents activated a recording device to memorialize the interview. During the interview, F. NORMAN admitted to violations of 18 U.S.C. § 922(a)(1)(A) (dealing firearms without a license) and 18 U.S.C. § 922(a)(6) (Materially False Statements to a Federal Firearms Licensee). Agents advised NORMAN that he had purchased over 100 firearms and NORMAN stated he had sold every firearm except for one, a Glock 19X that was inside the silver Honda Accord. NORMAN stated he would sell these firearms for profit and he did not keep track of to whom he sold firearms. F. NORMAN provided Agents with consent to search his silver Honda Accord, bearing Vehicle Identification Number (VIN) 1HGCM56894A001550 and his cellular telephone, a red, iPhone SE, bearing serial number F18CQS2PPLJP, the **SUBJECT ELECTRONIC DEVICE**.

44.     On December 1, 2020, Agents performed a consensual search of Fredrick NORMAN's silver Honda Accord, bearing Vehicle Identification Number (VIN) 1HGCM56894A001550. Agents recovered one Glock, Model 19X, 9mm pistol, bearing serial number BRPW460, 3 empty firearms boxes, and miscellaneous firearms-purchasing paperwork.

45.     On December 1, 2020, Agents performed a consensual search of F. NORMAN's red, iPhone SE, bearing serial number F18CQS2PPLJP, the **SUBJECT ELECTRONIC DEVICE**. While looking at text messages, Agents observed there was only one new text message from December 1, 2020, the present date. The next newest text message was dated July 24, 2020. Agents know, from a review of Brianna WALKER's phone, that WALKER and F. NORMAN were involved in a text message conversation on December 1, 2020. This text message conversation was not present on F. NORMAN's phone. Agents also observed text messages advising F. NORMAN to install an application called Signal, to which F. NORMAN agreed. Signal is an application which allows for secure, encrypted messaging between cellular

phones. These messages are not able to be retrieved from Signal by any legal demand as they are stored locally on a user's device. Agents observed that the application, Signal, was no longer on F. NORMAN's phone. I believe that once F. NORMAN learned that the ATF was speaking with WALKER, F. NORMAN deleted numerous text message conversations as well as the application Signal, in an effort to hinder law enforcement's ability to view F. NORMAN's communications. While viewing the **SUBJECT ELECTRONIC DEVICE**, Agents also observed F. NORMAN's iCloud account associated with the email address "sailesproductions@yahoo.com," the **TARGET ACCOUNT**.

46.     On December 4, 2020, I submitted a preservation letter to Apple, in order to preserve the account associated with the **TARGET ACCOUNT**.

47.     ATF records checks revealed that, Fredrick NORMAN, Brianna WALKER, Stephen NORMAN, and Charles O'BANNON are not licensed to deal, import or manufacture firearms and are thus prohibited from doing so under 18 U.S.C. § 922(a)(1)(A).

<u>**CONCLUSION**</u>

48.     Based on the foregoing information, I believe that there is probable cause to believe that the **TARGET ACCOUNT** will contain evidence, fruits, and instrumentalities of crimes in violation of the Target Offenses. There is likely evidence present in the **TARGET ACCOUNT** that was deleted from the **SUBJECT ELECTRONIC DEVICE**, including text messages and telephone contacts.

49.     I further request that the Court direct APPLE, INC. to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control.  Because the warrant will be served on APPLE, INC., who will then compile the

requested records at a time convenient to it, good cause exists to permit the execution of the requested warrant at any time in the day or night.

50.     Therefore, I respectfully request that this Court issue a warrant for the search of the **TARGET ACCOUNT**, as further described in Attachment A, and authorize the subsequent seizure of the items described in Attachment B.


s/ Alan Gilmore
_____
Special Agent Alan Gilmore
Bureau of Alcohol, Tobacco, Firearms & Explosives

Affidavit submitted by email and attested to me as true and accurate by telephone consistent with Fed. R. Crim. P. 4.1 and 41(d)(3) this _____5th_____ day of __Janurary_____, 2021.

Henry S. Perkin

Digitally signed by Henry S. Perkin
DN: cn=Henry S. Perkin, o=U.S. Courts, ou, email=judge_henry_perkin@paed.uscourts.gov, c=US
Date: 2021.01.04 17:56:16 -05'00'

_____
Honorable Henry S. Perkin
United States Magistrate Judge

## ATTACHMENT A
### Property to Be Searched

This warrant applies to information and records that are stored at the premises owned,

maintained, controlled, or operated by Apple Inc. ("Apple"), headquartered at 1 Infinite Loop,

Cupertino, California 95014, pertaining to the iCloud account associated with the email address

"sailesproductions@yahoo.com" (the **TARGET ACCOUNT**).

**ATTACHMENT B**
**Items to Be Seized**

I.     **Files and Accounts to be produced by Apple from March 1, 2020, through December 1, 2020.**

To the extent that the information described in Attachment A is within the possession, custody, or control of Apple, Apple is required to disclose the following information to the government for the **TARGET ACCOUNT**. Such information should include the below-described content of the subject account:

a.     All device registration or customer information associated with the account and associated devices, including name, address, email address, telephone number, MAC address, and UDID;

b.     All customer service records, including support interactions, warranty and repair information;

c.     All iTunes data, including basic subscriber information, purchase information, and iTunes Match data;

d.     All Apple retail store, online store, and gift card information associated with the account;

e.     All iCloud data existing on Apple's servers, including subscriber information, mail logs, and all iCloud content, including, but not limited to, email, photo stream, photo library, iCloud Drive, contacts, calendars, bookmarks, and Safari browsing history;

f.     All iOS device activation information and device backups, including photos and videos in the Camera Roll, device settings, app data, iMessage, SMS, and MMS messages and voicemail;

g.     All FaceTime records, including call invitation logs;

h.     All iMessage records, including capability query logs;

i.     All Find My iPhone records and transactional activity, including records of all attempts to locate, lock, or wipe the device;

j.     All My Apple ID, iForgot, and Game Center connection logs and transactional records;

k.      Subscriber Information, including the name and location, supplied by the user at the time of registration, the date the account was created and all of the services of Apple used by each **TARGET ACCOUNT**;

l.      Records of user activity for each connection made to or from the **TARGET ACCOUNT**, including log files; messaging logs; the date, time, length, and method of connections; data transfer volume; user names; and source and destination Internet Protocol addresses, and any telephone, instrument or other unique identifiers associated with the **TARGET ACCOUNT**; and

m.      All telephone or instrument numbers associated with the **TARGET ACCOUNT** (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), International Mobile Subscriber Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI")).

## II.     Information to be Seized by Law Enforcement Personnel

a.      Any and all records that relate in any way to the **TARGET ACCOUNT** described in Attachment A that are evidence, fruits, and instrumentalities of violations of violations of 18 U.S.C. § 922(a)(1)(A) (Dealing Firearms Without a License) and 18 U.S.C. § 922(a)(6) (Materially False Statements to a Federal Firearms Licensee)

b.      All images, messages, communications, calendar entries, and contacts, including any and all preparatory steps taken in furtherance of these crimes;

c.      Communication, information, documentation and records relating to who created, used, or communicated with the account or identifier, including records about their identities and whereabouts;

d.      Evidence of the times the account was used;

e.      All images, messages and communications regarding wiping software, encryption or other methods to avoid detection by law enforcement;

f.      Passwords and encryption keys, and other access information that may be necessary to access the account and other associated accounts;

g.      Credit card and other financial information, including but not limited to, bills and payment records evidencing ownership of the subject account;

h.      All "address books" or other lists of contacts.

III.    **Nature of the Search**

With respect to the search of the information provided pursuant to this warrant, law enforcement personnel will make reasonable efforts to use methods and procedures that will locate and expose those categories of files, documents, communications, or other electronically stored information that are identified with particularity in the warrant while minimizing the review of information not within the list of items to be seized as set forth herein, to the extent reasonably practicable.   If the government identifies any seized communications that may implicate the attorney-client privilege, law enforcement personnel will discontinue its review and take appropriate steps to segregate all potentially privileged information so as to protect it from substantive review.   The investigative team will take no further steps regarding any review of information so segregated absent further order of the court.   The investigative team may continue to review any information not segregated as potentially privileged.